# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN NASHEL and
TIM ROBINSON,   Case No. 2:22-cv-10633

Plaintiffs,   HONORABLE STEPHEN J. MURPHY, III

v.

THE NEW YORK TIMES COMPANY,

Defendant.
                                                   /

## OMNIBUS OPINION AND ORDER

Plaintiffs John Nashel and Tim Robinson brought the present putative class action against Defendant The New York Times. ECF 1. After Defendant moved to dismiss the complaint, ECF 15, Plaintiffs filed an operative amended complaint. ECF 16. Defendant then moved to dismiss the amended complaint. ECF 20. Defendant's motion relied on two theories. First, the complaint failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 1269. And second, Plaintiffs' claims are barred by a three-year limitations period. *Id.*

In the alternative, Defendant moved to certify a question to the Michigan Supreme Court: whether the three-year limitations period under Mich. Comp. Laws § 600.5805(2) governs claims for damages under Michigan's Preservation of Personal Privacy Act ("PPPA"), Mich. Comp. Laws §§ 445.1711–.1715. ECF 21. Non-party News/Media Alliance moved for leave to file an amicus brief in support of certifying the question to Michigan's highest court. ECF 23. For the reasons below, the Court

1

will grant the motion to dismiss[1] and deny as moot the motions to certify a question to the Michigan Supreme Court and for leave to file an amicus brief in support.

## BACKGROUND[2]

Plaintiffs were subscribers to Defendant's newspaper, *The New York Times*. ECF 16, PgID 693. Defendant allegedly disclosed Plaintiffs' private reading information[3] and "other categories of individualized data and demographic information" to "list brokers, data aggregators, data cooperatives, data brokers, and other[] . . . third-party intermediaries" without Plaintiffs' consent. *Id.* at 685, 692, 706–07. In turn, those intermediary companies disclosed Plaintiffs' private reading information to other third parties. *Id.* at 685–86, 705–06. As a result, Plaintiffs "received a barrage of unwanted junk mail." *Id.* at 685.

A disclosure of private reading information without a customer's consent violates the PPPA. Under the PPPA,

> A person . . . engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not knowingly disclose to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business.

---

[1] Based on the parties' briefing, the Court will resolve the motion without a hearing. *See* Fed R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2).
[2] Because the Court must view all facts in the light most favorable to the nonmoving party, *see Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008), the Court's recitation does not constitute a finding or proof of any fact.
[3] Plaintiffs defined "private reading information" as "full names, titles of publications subscribed to, and home addresses." ECF 16, PgID 692.

2

Mich. Comp. Laws § 445.1712. Plaintiffs claimed that "[d]ocumented evidence confirms" Defendant violated the PPPA. For instance, one third-party list broker offered to rent access to a mailing list called "The New York Times Mailing List." ECF 16, PgID 686–87. Plaintiffs attached as an exhibit a "data card" in which the list broker advertised access to the private reading information of *The New York Times*'s readers. ECF 16-2, PgID 719–20. Another list broker data card advertised access to "The New York Times Enhanced Database." ECF 16, PgID 687–88; ECF 16-3, PgID 722. The two data cards were published online in 2007 and 2008, respectively.[4] ECF 16, PgID 686–88.

Besides the data cards, Defendant maintained a "Privacy Policy" in 2015 that stated,

> If you are a print subscriber, we may exchange or rent your name and mailing address (but not your email address) and certain other information, such as when you first subscribed to The New York Times with other reputable companies that offer marketing information or products through direct mail.

ECF 16, PgID 689–90; ECF 16-5, PgID 761. And in 2020, a case study[5] was published "on the marketing strategies employed by Virginia Beach, Virginia to boost the city's tourism." ECF 16, PgID 690. The case study noted that "Virginia Beach marketers have used list-rental strategies to identify e-mail lists that might prove to be useful

---

[4] Plaintiffs explained that the data cards "are no longer publicly advertised online" "on [the] list brokers' publicly accessible websites." ECF 16, PgID 689.

[5] The case study was featured in a publication titled "Direct, Digital & Data-Driven Marketing." *See* ECF 16, PgID 690 n.5 (citing Lisa Spiller, *Direct, Digital & Data-Driven Marketing 5th Ed.,* SAGE Publications Ltd. (2020), http://books.google.com/books?id=fSPLDwAAQBAJ).

3

in connecting with prospective tourists." *Id.* The study added that the city had "recently run a dedicated Virginia Beach e-mail campaign with lists from WeatherBug, eTarget Media, iExplore, Orbitz, Sherman's Travel, Daily Candy, *The New York Times*, *The Washington Post*, The News & Observer (Raleigh, NC), eBrains, and *The Baltimore Sun*." *Id.* (emphasis in original).

## LEGAL STANDARD

The Court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the complaint fails to allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Court views the complaint in the light most favorable to the plaintiff, presumes the truth of all well-pleaded factual assertions, and draws every reasonable inference in the nonmoving party's favor. *Bassett*, 528 F.3d at 430.

But the Court will not presume the truth of legal conclusions in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true or not," then the Court must dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009). In a Rule 12(b)(6) motion, courts can only "consider the [c]omplaint and any exhibits attached thereto . . . [and] items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430

4

(citation omitted); *see also Decoration Design Sols., Inc. v. Amcor Rigid Plastics USA, Inc.*, 553 F. Supp. 3d 424, 427 (E.D. Mich. 2021) (Murphy, J.).

## DISCUSSION

The Court will first explain why the catch-all, six-year limitations period applies to the PPPA rather than the three-year period. After, the Court will explain why Plaintiffs' complaint fails to state a claim under Rule 12(b)(6).

I.  <u>Limitations Period</u>[6]

Under the *Erie* Doctrine, State limitations periods "must be applied by federal courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) (citing *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99 (1945)). Here, the Court's jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Michigan's law on the relevant limitations period thus applies. *See* ECF 16, PgID 693–94.

The PPPA lacks an express limitations period provision. *See* Mich. Comp. Laws §§ 445.1711–.1715. And the Michigan Supreme Court has never settled the question of whether the PPPA should be governed by the six-year limitations period under Michigan Compiled Laws § 600.5813 (catch-all limitations period for personal actions) or the three-year limitations period under § 600.5805 (limitations period for injuries to persons or property). *See Pratt v. KSE Sportsman Media, Inc.,* ---F. Supp.

---

[6] Because the applicability of the limitations period is a threshold issue, *Zappone v. United States*, 870 F.3d 551, 554–55 (6th Cir. 2017), the Court will first address whether the claim is barred by the relevant limitations period before turning to Defendant's other ground for dismissal.

5

3d---, 2022 WL 469075, at *5 (E.D. Mich. 2022) ("[N]o controlling Michigan authority is directly on point."). When "the [S]tate supreme court has not yet addressed the issue presented, [the Court] must predict how the [State supreme] court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation and quotation omitted). "The Court may use the decisional law of the [S]tate's lower courts, other federal courts construing [S]tate law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule" to make the prediction. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999).

Plaintiffs claimed that "[t]he statutory period for this action is six years" under Michigan's catch-all limitations period, § 5813. ECF 16, PgID 685 n.1. Defendant argued that the three-year limitations period should apply because a PPPA claim is at bottom a common law privacy tort claim, or in the alternative, it "is nonetheless one for personal injury." ECF 20, PgID 1291–96. The six-year limitations period applies to the PPPA for two reasons.

First, Plaintiffs' cause of action arises from the PPPA, which lacks an explicit limitations period. And in Michigan "a civil cause of action arising from a statutory violation is subject to the six-year limitation period found in § 5813, if the statute itself does not provide a limitation period." *DiPonio Constr. Co. v. Rosati Masonry Co.*, 246 Mich. App. 43, 56 (2001). A cause of action arising from the PPPA—a statute lacking a limitation period—thus fits perfectly into that succinct rule.

6

Second, Michigan courts look to "the 'nature and origin' of a claim to determine the applicable limitations period." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1131–33 (6th Cir. 1995) (collecting Michigan Supreme Court cases). The nature and origin of a particular claim depends on framing. Defendant framed a PPPA claim as one for the "redress of an invasion of privacy, which is a common law claim that traditionally sounds in tort." ECF 20, PgID 1292 (collecting cases). Under that broad framing, a PPPA claim would fall within the three-year limitations period, § 5805. But in response, Plaintiffs asserted that their PPPA claim protects "the right to privacy in one's audiovisual and reading materials." ECF 25, PgID 1463 (cleaned up). Employing Plaintiffs' more narrow framing, a PPPA claim would fall within the six-year limitations period, § 5813.

Although several courts have described the PPPA to be "similar in kind to rights protected by the common-law tort of invasion of privacy, the right of privacy in one's reading materials is nonetheless the creation of a statute; it did not exist under common law." *Krassick v. Archaeological Inst. of Am.*, No. 2:21-cv-180, 2022 WL 2071730, at *3 (W.D. Mich. June 9, 2022) (quotation marks and citation omitted). Indeed, the cases Defendant cited to support the assertion that the PPPA is "by nature[] a common law tort of invasion of privacy" suggest that the PPPA is only *similar* to that particular tort rather than a *codification* of the tort. *See* ECF 20, PgID 1291–92 (collecting cases).

And based on the Court's research, no Michigan case filed before 1989 (the PPPA's effective date) included a tort invasion-of-privacy claim based on the right to

7

privacy in one's reading materials or the dissemination of one's name and address. *See Krassick*, 2022 WL 2071730, at *1, 4, *see generally Tobin v. Mich. Civ. Serv. Comm'n*, 416 Mich. 661, 673–74 (1982) ("Names and addresses are not ordinarily personal, intimate, or embarrassing pieces of information. . . . No other jurisdiction has ever recognized a cause of action based on the release of an individual's name and address, without more."); *Int'l Union, United Plant Guard Workers of Am. (UPDWA) v. Dep't of State Pol.*, 422 Mich. 432, 450–54 (1985).

In the end, Defendant's framing of the PPPA as an invasion-of-privacy tort is too broad. Rather, the PPPA protects against a particular kind of invasion—the dissemination of one's reading materials, name, and address without consent. And before the PPPA, Michigan courts did not recognize the injury as a traditional tort. *See Krassick*, 2022 WL 2071730, at *4. Because Plaintiffs' "right to recovery arises from a statute rather than a common-law right," § 5805 does not apply. *Id.* at *3 (cleaned up); *cf. Citizens for Pretrial Justice v. Goldfarb*, 415 Mich. 255, 269–70 (1982). "Accordingly, the residual six-year statute of limitations governing all other personal actions, § 5813, applies to the present case." *Goldfarb*, 415 Mich. at 270 (citations omitted).

II.  Failure to State a Claim

The PPPA "makes it unlawful for a person . . . engaged in the business of selling written material to disclose information personally identifying the customer." *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (E.D. Mich. 2018) (citing Mich. Comp. Laws § 445.1712). Plaintiffs alleged that (1) Defendant disclosed all its

8

subscribers' private reading information, (2) to "data aggregators, data appenders, data cooperatives, and lists brokers," (3) "throughout the relevant pre-July 31, 2016 time period," (4) without consent. ECF 16, PgID 689, 691. In support, Plaintiffs relied on third-party data cards, Defendant's privacy policy, and a case study about Virginia Beach renting Defendant's subscriber list. *Id.* at 687–90; ECF 25, PgID 1453–56. But Plaintiffs' allegations, even in light of that evidence, fail to clear the plausibility threshold. Two reasons support the finding.

First, Plaintiffs relied on evidence that creates only suspicion as to whether Defendant violated the PPPA during the pre-July 31, 2016 period.[7] And "a complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008) (citing *Twombly*, 550 U.S. at 555–56) (emphasis omitted). The two list broker data cards attached to the complaint were posted years before the relevant period. One data card listed subscription counts "through 06/30/2007." ECF 16-2, PgID 719. The second data card was posted in 2008. ECF 16, PgID 687–88.

Plaintiffs acknowledged that the data cards "pre-dat[e] the relevant pre-July 31, 2016 time period," but they waved away the timing issue by asserting, "[the complaint] specifically allege[d] that Defendant continued to systematically engaged

---

[7] The parties dispute whether the relevant time should be extended due to tolling. *See* ECF 25, PgID 1447–48, 1468–69; ECF 28, PgID 1604 n.3. The Court's analysis would not change even if the Court were to find that Plaintiffs' claims were tolled by 101 days. *See* ECF 25, PgID 1448–49 ("[A]ny disclosure of Plaintiffs' [private reading information] between December 14, 2015 and July 30, 2016 is actionable in this case."). Thus, the Court need not reach the issue here.

9

in the same wholesale disclosure practices as advertised in the 2007 and 2008 data[ ]cards over the course of the next decade plus." ECF 25, PgID 1453–54 (citing ECF 16, PgID 689). Plaintiffs' proposed cure for the timing issue thus relied on a legal-conclusion inference: that Defendant systematically violated the PPPA from 2007 onward. But the Court will not presume the truth of legal conclusions. *Iqbal*, 556 U.S. at 678. Because Plaintiffs cannot otherwise account for the near-decade time gap, the data cards make the complaint's allegations merely *possible* rather than plausible.

Plaintiffs also claimed that Defendant's privacy policy required an inference that Defendant "was actively selling, renting, exchanging, or otherwise disclosing its subscribers' [p]rivate [r]eading [i]nformation" during the pre-July 31, 2016 period. ECF 16, PgID 689. Yet Defendant's policy explained that it "*may* exchange or rent [a subscriber's] name and mailing address"; not "*will* exchange or rent" the private reading information. *Id.* The distinction matters. The policy, not moored by a time constraint, shows only that Defendant might disclose information in the future, not that any information was plausibly disclosed.

The Virginia Beach case study likewise raises timing questions. The study was published in 2020, and it detailed how Virginia Beach had "*recently* run a dedicated . . . e-mail campaign with lists from [Defendant and other media outlets]." ECF 16, PgID 690 (emphasis added). It follows that the use of "recently" suggests those subscriber lists were obtained years after the relevant time. *See id.* And even if Virginia Beach had obtained the list during the pre-July 31, 2016 period—four years

10

before the case study was published—the study explains neither who provided the list to Virginia Beach nor what information was on the list. Accordingly, the case study not only misses the mark on timing but also fails to clarify who was responsible for providing the subscriber list and what information the subscriber list contained.

Second, and beyond the timing concerns, the content of the evidence does not create a reasonable inference that Defendant violated the PPPA. Admittedly, the two third-party list broker data cards each appeared to claim access to the private reading information of over a million active United States *The New York Times* subscribers. ECF 16, PgID 686–88; ECF 16-2, PgID 713–20 ("The New York Times Mailing List"); ECF 16-3, PgID 722 ("The New York Times Enhanced Database"). Like the Virginia Beach case study, however, nothing on the data cards explains how the list brokers received Defendant's subscription list. *See* ECF 16-2, PgID 713–20; ECF 16-3, PgID 722. The data cards thus fail to support a crucial element of Plaintiffs' alleged action: that *Defendant* "engaged in the business of selling written material to disclose information personally identifying the customer." *Horton*, 380 F. Supp. 3d at 682.

Plaintiffs skimmed over the gaping omission and reasoned that because "the underlying [private reading information] necessarily originated from [Defendant]," it "was thus disclosed in the first instance by . . . Defendant." ECF 25, PgID 1455 n.5; *see also* ECF 25, PgID 1458–59 ("[T]he rental, sale, or exchange of records reflecting customers' purchases of subscriptions to [] *The New York Times* from Defendant would necessarily have originated from [] Defendant (either directly or indirectly through intermediaries)."). Simply put, Plaintiffs could only connect Defendant's

11

alleged conduct to the data cards through a large inferential leap. Although the Court must "draw[] every reasonable inference in [Plaintiffs'] favor," *Bassett*, 528 F.3d at 430, the Court need not infer into existence the central element of a PPPA claim— that Defendant was the culpable actor. In the end, Plaintiffs' evidence only indirectly aimed blame at Defendant, but the indirect evidence failed to create a reasonable inference of Defendant's culpability. Plaintiffs are thus left with their bare conclusion that Defendant systematically violated the PPPA. And the Court will not, of course, presume the truth of legal conclusions. *Iqbal*, 556 U.S. at 678.

The Virginia Beach case study and Defendant's privacy policy fare no better in support of the alleged action. The study stated that Virginia Beach "r[a]n a dedicated . . . e-mail campaign with lists from" several media outlets including Defendant. ECF 16, PgID 690. But Plaintiffs alleged that Defendant disclosed their "full names, titles of publications subscribed to, and home addresses," not email address. *Id.* at PgID 692. Indeed, Defendant's privacy policy even clarified that it would not "exchange or rent [subscriber] . . . email address[es]." *Id.* at 689. The privacy policy also explained that Defendant "*may* exchange or rent" subscriber private reading information. *Id.* But the policy fails to suggest that Defendant *did* exchange or rent such information. In fact, the policy expressed no admission of completed or forecasted conduct; it advised of only the *possibility* that Defendant may disclose certain subscriber information. *See id.* Put together, the Virginia Beach case study and the privacy policy add nothing to help Plaintiffs establish that Defendant plausibly violated the PPPA.

In all, Plaintiffs' complaint fails to state a claim under Rule 12(b)(6). The Court will therefore grant Defendant's motion to dismiss. ECF 20.

## CONCLUSION

Because the Court will dismiss the complaint for failure to state a claim, the Court will deny as moot Defendant's motion to certify the limitations period question to the Michigan Supreme Court, ECF 21. The Court will also deny as moot non-party News/Media Alliance's motion for leave to file an amicus brief in support of certification, ECF 23.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that the motion to dismiss [20] is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion to certify a question to the Michigan Supreme Court [21] and the motion for leave to file an amicus curiae brief [23] are **DENIED AS MOOT**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III<br>
STEPHEN J. MURPHY, III<br>
United States District Judge

Dated: October 11, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 11, 2022, by electronic and/or ordinary mail.

s/ David P. Parker<br>
Case Manager