## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY BOZUNG, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTIANBOOK, LLC f/k/a CHRISTIAN BOOK DISTRIBUTORS CATALOG, LLC, <br><br> Defendant. | *FILED UNDER SEAL* <br> Case No. 1:22-cv-00304-HYJ-RSK <br><br> Honorable Hala Y. Jarbou <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br> **JURY TRIAL DEMANDED** |

Plaintiff Timothy Bozung ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based on personal knowledge as to facts pertaining specifically to himself.

### INTRODUCTION

1.  Defendant Christianbook, LLC f/k/a Christian Book Distributors Catalog, LLC ("Christianbook") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *The Drop Box - The DVD* video purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others – including, without limitation, to Experian Marketing Solutions, Inc. and Experian Information Solutions, Inc. (together, "Experian"), I-Behavior, Inc. ("I-Behavior"),

NextAction, Wiland, Inc. ("Wiland"), Alterian, InfoGroup Media Solutions ("Infogroup"), and Datalogix/Oracle ("Oracle") (collectively, the "Data Companies"), to Atlantic List Company, Inc. ("ALC") and Millard Group, Inc. ("Millard") (collectively, the "List Managers"), and to various downstream renters and exchangers of such data – which in turn disclosed Plaintiff's information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiff has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading, Listening, and Viewing Information (defined below) during the relevant pre-July 31, 2016 time period,[1] Christianbook violated Michigan's Preservation of Personal Privacy Act,

---

[1]     The statutory period for this action is six years, which is 2,190 days. *See* M.C.L. § 600.5813.

     The applicable six-year limitation period was tolled for 102 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, <u>including but not limited to any deadline for filing an initial pleading</u> . . . are suspended as of March 10, 2020 <u>and shall be tolled</u> until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, <u>including but not limited to the deadline for the initial filing of a pleading</u> … any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added

by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2.     Documented evidence confirms these facts.  For example, a list broker,

NextMark, Inc. ("NextMark"), acting on Defendant's behalf (or on behalf of one or

more of the List Managers serving as Defendant's representative(s)), offers to

provide renters access to the mailing list titled "Christianbook Catalog Buyers

Mailing List", which contains the Private Reading, Listening, and Viewing

Information of 3,264,000 of Christianbook's U.S. customers at a base price of

"$95.00/M [per thousand]," (i.e., 9.5 cents apiece), as shown in the screenshot

below:

---

Thus, the applicable statutory period (i.e., the "relevant pre-July 31, 2016 time period") for this action is December 20, 2015 (2,293 days prior to the commencement of the instant action on March 31, 2022) through July 30, 2016.

[2]     In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. Sept. 28, 2018).

3



See **Exhibit A** hereto.

3.      Notably, the Nextmark data card confirms that the persons on the mailing list "are active Christians . . . from many denominations."  It goes on to state, "[t]hey are actively involved in their churches and are frequent contributors to charitable offers."  And, in bold typeface, the data card notes, "**Ethnic & Religious enhancements are available!!  Please inquire for segment options.**"

4.      It is standard practice for list brokers and list renters to issue new data cards each year, and to update its data cards from month to month to reflect updated subscriber counts.  *See, e.g.*, *Boelter v. Hearst Communications, Inc.*, Case No. 15-cv-03934-AT, ECF No. 1 at Ex. B (S.D.N.Y.) (Hearst Masterfile Mailing List

NextMark data card showing "COUNTS THROUGH 04/30/2015"); *Horton v. Gamestop Corp., d/b/a Game Informer*, Case No. 18-cv-00596-GJQ-PJG, ECF No. 1 at Ex. B (W.D. Mich.) (Game Informer Magazine Mailing List Nextmark data card showing "COUNTS THROUGH 04/09/2018"). Consistent with this standard practice, another "data card," substantially similar to the one shown above, with the same rates as shown above, was also publicly advertised by various list brokers acting on Defendant's behalf (or on behalf of one or more of the List Managers serving as Defendant's representative(s)) during the relevant pre-July 31, 2016 time period, with a slightly different title. Throughout the relevant pre-July 31, 2016 time period, NextMark and other list brokers, including SRDS, Inc., offered (on Defendant's behalf, or on behalf of one or more of the List Managers serving as Defendant's representative(s)) to provide renters and exchangers access to the mailing list titled "Christian Book Distributors (CBD) Catalog Buyers," including customers from 2015-2016, which contained the Private Reading, Listening, and Viewing Information of approximately 1.4 million customers of Christianbook (which at the time was known as Christian Book Distributors, LLC, as explained further below in paragraph 21) at a base price of $95.00/M per thousand, (i.e., 9.5 cents apiece).[3]

---

[3]     This data card titled "Christian Book Distributors (CBD) Catalog Buyers" was accessible during the relevant pre-July 31, 2016 time period at

5.      Even during the relatively brief period of discovery taken to date in this litigation, Plaintiff has obtained documents, ESI, and information from Christianbook and various third parties that firmly support the allegations set forth herein.

6.      Discovery has already revealed that Christianbook transmitted data files to Experian, I-Behavior, NextAction, and Wiland at least as frequently as once a month throughout the relevant pre-July 31, 2016 time period for, *inter alia*, data appending, modeling, data exchange (including prospecting via data cooperatives), and list rental purposes, pursuant to contracts between Christianbook and each of these Data Companies.  The data files that Christianbook transmitted at least as frequently as once a month (throughout the relevant pre-July 31, 2016 time period) to Experian, I-Behavior, NextAction, and Wiland contained, *inter alia*, the following information for each of Christianbook's customers: the customer's name and address and the individual transaction records reflecting the customer's transaction histories (transactional information and product-level data), i.e., records showing the name of each product that the customer purchased from Christianbook, and the dates on which, the means by which, and the amounts for which each product was purchased.

http://www.srds.com/directnet/dnet?action=recoListDetail&mid=611115&unit=0, and was assigned the ID number 611115 by SRDS.

7.     By way of example, discovery has thus far already revealed that Christianbook transmitted Plaintiff Timothy Bozung's Private Reading, Listening, and Viewing Information to Experian during the relevant pre-July 31, 2016 time period. In response to a subpoena issued by Plaintiff's counsel, Experian produced to Plaintiff an Excel spreadsheet containing Plaintiff's Private Reading, Listening, and Viewing Information that Experian received from Christianbook, including during the relevant pre-July 31, 2016 time period. The spreadsheet contains, *inter alia*, Plaintiff's first and last name, address, e-mail address, method of purchase for each product purchased, date of each product purchased, and title of each product purchased.  The spreadsheet shows that Plaintiff Bozung was a purchaser of *The Drop Box - The DVD,* and includes transaction-level data concerning that purchase, such as the order date, purchase price, and order method (i.e., from Christianbook, via its website).  Discovery has likewise revealed that, during the relevant pre-July 31, 2016 time period, Christianbook transmitted to Experian the Private Reading, Listening, and Viewing Information of tens of thousands of its other customers who reside in Michigan.

8.     In addition to obtaining the personal and transactional data of prospective customers from the Data Companies in return for transmitting all of its customers' Private Reading, Listening, and Viewing Information to the Data Companies, Christianbook also received back from the Data Companies "enhanced"

lists to which additional personal, demographic, and behavioral information had been appended by the Data Companies pertaining to each customer appearing on Christianbook's lists. Christianbook then "rented" or "exchanged" these lists on the open market, to anyone interested in renting them (for money) or exchanging for them (whereby Christianbook would receive lists of prospective customers from the entities on the other side of the transaction). During the relevant pre-July 31, 2016 time period, Christianbook marketed the availability of its customer lists for rental by engaging List Managers ALC and Millard, and possibly others, to manage the rental and exchange of its customer lists to third parties pursuant to contracts entered into between Christianbook and the List Managers. During the relevant pre-July 31, 2016 time period, the List Managers promoted, on Christianbook's behalf, Christianbook's customer lists and enhanced customer lists on the websites of various list brokers, including NextMark and SRDS. Pursuant to these contractual arrangements, Christianbook was required to, and in fact did, transmit its entire customer files as well as its enhanced customer files (which included Plaintiff's and all Class members' Private Reading, Listening, and Viewing Information), to the List Managers on a regular basis, including throughout the pre-July 31, 2016 time period.

9.     During the relevant pre-July 31, 2016 time period, Christianbook approved the transmission of its subscribers' Private Reading, Listening, and

Viewing Information, as advertised on its customer lists and enhanced customer lists promoted in the data cards posted by the List Managers on NextMark's and SRDS's websites, their own websites, and other data brokers' websites, to renters and exchangers on at least 78 separate occasions. And after receiving payment from the renters or reciprocal lists from the exchangers of this data, the List Managers (and possibly other entities as well), acting on Christianbook's behalf and at its direction, then transmitted, still during the relevant pre-July 31, 2016 time period, the Private Reading, Listening, and Viewing Information of Christianbook's subscribers to the various third-parties who had rented and exchanged for this data – again, on no less than 78 occasions. The "selects" available for inclusion in the Christianbook customer lists that were rented or exchanged by or with Christianbook included product selects that indicated the underlying products or product categories that each customer on the list had purchased, and on numerous of the 78 occasions on which Christianbook rented or exchanged its customers' Private Reading, Listening, and Viewing Information during the relevant time period, the renter or exchanger requested the inclusion of that product-type data on the list that it had rented or exchanged for. The majority of these 78 list rental and list exchange transmissions were made to non-profits, charitable organizations, and religious organizations seeking contributions from persons to whom no goods or services would be provided in return for their contributions.

9

10.     Discovery thus far has also revealed that, pursuant to Christianbook's contracts with I-Behavior, Wiland and NextAction in effect during the relevant pre-July 31, 2016 time period, Christianbook was required to, and in fact did, transmit its entire customer file to I-Behavior, Wiland and NextAction, and then update those customer files with additional transmissions of customers' data, on a regular basis, including throughout the pre-July 31, 2016 time period, for list appending, prospecting, data cooperative, and other such data services.

11.     Christianbook also routinely transmitted its entire database of customer purchase information to the non-profit Family Christian during the relevant pre-July 31, 2016 time period for additional data appending and enhancement services, and in fact Plaintiff's Private Reading, Listening, and Viewing Information, with additional data appended to it by Family Christian, appears on the spreadsheet produced by Experian in response to Plaintiff's subpoena (discussed above in paragraph 7).

12.     Notably, the initial disclosures Defendant made to Plaintiff in this litigation pursuant to Rule 26(a)(1) concede that four of Defendant's employees and six individuals from InfoGroup Media Solutions, Experian Marketing Services, Atlantic List Company, Inc., Wiland Direct, I-Behavior Inc., and Datalogix/Oracle "have knowledge regarding . . . Christianbook's disclosure of information concerning its Michigan customers who purchased written materials, sound

10

recordings and/or video recordings from December 21, 2015 to July 21, 2016" and "contracts Christianbook entered into with third parties, in force from December 21, 2015 to July 31, 2016, setting forth the terms, circumstances and conditions under which Christianbook disclosed information to those parties."

13.     Christianbook's data sharing practices were consistent with industry-wide data sharing practices that sellers of written and audio-visual materials engaged in, without their customers' consent, during the relevant pre-July 31, 2016 time period. *See Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017) (granting plaintiff's motion for summary judgment and describing similar data sharing practices during the same time period); *Coulter-Owens v. Time, Inc.*, 308 F.R.D 524, 528-29 (E.D. Mich. 2015) (certifying Michigan class under PPPA and describing defendant's similar data sharing practices).

14.     By renting, exchanging, or otherwise disclosing the Private Reading, Listening, and Viewing Information of its Michigan-based customers during the relevant pre-July 31, 2016 time period, Christianbook violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

11

PPPA § 2.

15.     Accordingly, Plaintiff brings this Second Amended Class Action Complaint against Christianbook for its intentional and unlawful disclosure of its customers' Private Reading, Listening, and Viewing Information in violation of the PPPA.

## NATURE OF THE CASE

16.     To supplement its revenues, Christianbook rents, exchanges, or otherwise discloses all of its customers' information—including their full names, the titles of written materials, sound recordings, or video recordings purchased, and home addresses (collectively "Private Reading, Listening, and Viewing Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, ethnicity, and religion—to the Data Companies and the List Managers, as well as various other third party renters and exchangers of this data, all without the written consent of its customers.  During the relevant pre-July 31, 2016 time period, Christianbook (then known as Christian Book Distributors, LLC) likewise rented, exchanged, or otherwise disclosed all of its customers' Private Reading, Listening, and Viewing Information to the Data Companies and the List Managers, as well as various other third party renters and exchangers of this data, all without the written consent of its customers.

17.     By renting, exchanging, or otherwise disclosing – rather than selling –

its customers' Private Reading, Listening, and Viewing Information, Christianbook is able to disclose the information time and time again to countless third parties.

18.     Christianbook's disclosure of Private Reading, Listening, and Viewing Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

19.     While Christianbook profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading, Listening, and Viewing Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Christianbook does not obtain its customers' written consent prior to disclosing their Private Reading, Listening, and Viewing Information.

## **PARTIES**

20.     Plaintiff Timothy Bozung is a natural person and citizen of the State of Michigan and resides in Hudsonville, Michigan.  Plaintiff was a purchaser of *The Drop Box - The DVD* video, including prior to July 31, 2016.  *The Drop Box* video is sold by Christianbook.  While residing in, a citizen of, and present in Michigan, Plaintiff purchased *The Drop Box - The DVD* directly from Christianbook.  Prior to and at the time Plaintiff purchased *The Drop Box - The DVD*, Christianbook did not notify Plaintiff that it discloses the Private Reading, Listening, and Viewing

Information of its customers, and Plaintiff has never authorized Christianbook to do so.  Furthermore, Plaintiff was never provided any written notice that Christianbook rents, exchanges, or otherwise discloses its customers' Private Reading, Listening, and Viewing Information, or any means of opting out.  Since purchasing *The Drop Box - The DVD*, and during the relevant pre-July 31, 2016 time period, Christianbook disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators, data appenders, and/or data cooperatives, including to the Data Companies, who then supplement that information with data from their own files.  Moreover, during that same period, Christianbook (either directly or through one or more intermediaries, including the List Managers) rented or exchanged mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information to third parties seeking to contact Christianbook customers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

21.    Defendant Christianbook, LLC is a Delaware corporation with its headquarters and principal place of business in Peabody, Massachusetts. Christianbook does business throughout Michigan and the entire United States. Christianbook is the seller of various book titles such as *The Holy Bible*, as well as various video titles such as *The Drop Box - The DVD*.  During the relevant pre-July

31, 2016 time period, Defendant did business under the name "Christian Book Distributors Catalog, LLC".   On or about January 25, 2019, Christian Book Distributors Catalog, LLC merged into Christianbook, LLC. *See* **Exhibit B** hereto (filing with the Secretary of the Commonwealth for the Commonwealth of Massachusetts dated January 25, 2019 indicating that Christian Book Distributors Catalog, LLC "has merged out of existence into Christianbook, LLC (with Christianbook, LLC being the survivor)").

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

23.    The Court has personal jurisdiction over Christianbook because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of *The Drop Box - The DVD* in Michigan, Christianbook's direction of such *The Drop Box - The DVD video* into Michigan, and Christianbook's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading, Listening, and Viewing Information, including his residential address in Michigan, to another person, the effects of which were felt

from within Michigan by a citizen and resident of Michigan. Personal jurisdiction also exists over Christianbook in Michigan because Christianbook conducts substantial business within Michigan, such that Christianbook has significant, continuous, and pervasive contacts with the State of Michigan.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Christianbook does substantial business in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

25.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of written materials, sound recordings, and video recordings offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

26.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from

16

disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

27.    Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

28.    Michigan's protection of reading and audiovisual information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

29.    As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

30.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

31.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit C**).

32.     Despite the fact that thousands of Michigan residents have purchased Christianbook's written materials and video recordings, Christianbook disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market: Consumers' Private Information Has Real Value

33.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[4]

34.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

35.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[6]

36.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

[4]     **Exhibit D**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[5]     *See* **Exhibit E**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[6]     **Exhibit F**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

information in an open and largely unregulated market.[7]

37.    The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

38.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

39.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[7]    *See* **Exhibit G**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[8]    **Exhibit H**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N120616S.pdf (last visited July 30, 2021).

[9]    **Exhibit I**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

collections of consumer data.[10]

40.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[11]

41.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Christianbook share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within

---

[10]     *See* **Exhibit J**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[11]     *Id.*

[12]     *See* **Exhibit K**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

the reach of fraudulent telemarketers" and other criminals.[13]

42.     Information disclosures like those made by Christianbook are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[14]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

43.     Thus, information disclosures like Christianbook's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers

---

[13]     **Exhibit L**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at*: http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[14]     *Id.*

[15]     **Exhibit M**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 1, 2022).

from a host of scam artists."[16]

44.     Christianbook is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer's purchase information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry and other direct-to-consumer industries, and was an especially widespread practice in those industries during the relevant pre-July 31, 2016 time period.

45.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

46.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

47.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[17]  As a result,

---

[16]     *See id.*

[17]     *See* **Exhibit N**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[18]

48.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

49.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[19]

50.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

---

content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

[18]     *Id.*

[19]     *See* **Exhibit O**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

policies of protecting their data.[20]

51.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[21]

### *Christianbook Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading, Listening, and Viewing Information*

52.     Christianbook maintains a vast digital database comprised of its customers' Private Reading, Listening, and Viewing Information.  Christianbook discloses its customers' Private Reading, Listening, and Viewing Information to data aggregators and appenders, including the Data Companies, who then supplement that information with additional sensitive private information about each Christianbook customer, including his or her age, gender, ethnicity, and religion.  (*See, e.g.*, **Exhibit A**).

53.     Christianbook (either directly or through one or more intermediaries acting at its direction, including the List Managers) then rents and/or exchanges its

---

[20]     *See* **Exhibit P**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[21]     *See* **Exhibit Q**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

mailing lists—which include its customers' Private Reading, Listening, and Viewing Information identifying which individuals purchased particular written materials and particular audiovisual materials, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations and contributions, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

54. Christianbook also discloses its customers' Private Reading, Listening, and Viewing Information to data cooperatives, including the Data Companies, who in turn give Christianbook access to their own (and their other clients') mailing list databases.

55. As a result of Christianbook's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Christianbook that identify Christianbook's customers by their most intimate details such as their age, gender, ethnicity, and religion. Christianbook's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

56. Christianbook does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their

Private Reading, Listening, and Viewing Information and other sensitive information is being rented, exchanged, and otherwise trafficked on the open market.

57.     Consumers can purchase Christianbook's written and audiovisual materials through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, Christianbook never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, Christianbook uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading, Listening, and Viewing Information.

58.     As a result, Christianbook disclosed its customers' Private Reading, Listening, and Viewing Information – including their reading, listening, and viewing habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[22] – to anybody willing to pay for it.

---

[22]     **Exhibit R**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

59.     By and through these actions, Christianbook has intentionally disclosed to third parties its Michigan customers' Private Reading, Listening, and Viewing Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading, Listening, and Viewing Information disclosed to third parties by Christianbook without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

61.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and/or relevant third parties, including the Data Companies and List Managers.

62.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Christianbook is a "retailer or distributor" of written materials or sound or video recordings; (b)

whether Christianbook obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading, Listening, and Viewing Information; and (c) whether Christianbook's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information violated the PPPA.

63.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information.

64.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

65.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex

legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
**Violation of Michigan's Preservation of Personal Privacy Act**
**(PPPA § 2)**

66.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Christianbook.

68.     As a company that sells written materials and sound and video recordings directly to consumers, Christianbook is engaged in the business of selling written materials, sound recordings, or video recordings at retail. *See* PPPA § 2.

69.     By purchasing *The Drop Box - The DVD* video and other videos, Plaintiff purchased video recording directly from Christianbook. *See* PPPA § 2.

70.     Because Plaintiff purchased a video recording directly from Christianbook, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

71.     At various times during the pre-July 31, 2016 time period, Christianbook disclosed Plaintiff's Private Reading, Listening, and Viewing Information, which identified him as a purchaser of *The Drop Box - The DVD* video and other video recording titles, in at least three ways.

72.     First, Christianbook disclosed customer files and lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators and data appenders, including to the Data Companies, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the files and lists back to Christianbook.

73.     Second, Christianbook disclosed customer files and lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data cooperatives, including the Data Companies, who in turn gave Christianbook access to their own (and their clients') customer mailing list databases.

74.     Third, Christianbook (either directly or by one or more intermediaries acting on its behalf and at its direction, including the List Managers) rented and/or exchanged its mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and non-profit organizations soliciting monetary donations and contributions, volunteer work, and votes.

31

75.     Because the mailing lists included the additional information from the data aggregators and appenders, including from the Data Companies, the lists were more valuable, and Christianbook was able to increase its profits gained from the mailing list rentals and/or exchanges.

76.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, Christianbook disclosed to persons other than Plaintiff records or information concerning his purchase of video recordings from Christianbook.  *See* PPPA § 2.

77.     The information Christianbook disclosed indicates, *inter alia*, Plaintiff's name, address, and e-mail address, as well as the fact that he purchased video recording products, including the *The Drop Box - The DVD*, from Christianbook.  Accordingly, the records or information disclosed by Christianbook indicated Plaintiff's identity.  *See* PPPA § 2.

78.     Plaintiff and the members of the Class never consented to Christianbook disclosing their Private Reading, Listening, and Viewing Information to anyone.

79.     Worse yet, Plaintiff and the members of the Class did not receive notice before Christianbook disclosed their Private Reading, Listening, and Viewing Information to third parties.

80.     Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

81.     Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their purchases.

82.     Christianbook's disclosures of Plaintiff's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, list managers, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes (including to the Data Companies and the List Managers)—all in order to increase Christianbook's revenue and to obtain lists of prospective customers.   Accordingly, Christianbook's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

83.     By disclosing Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period, Christianbook violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

84.    As a result of Christianbook's unlawful disclosure of their Private Reading, Listening, and Viewing Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 to Plaintiff and to each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.    For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.    For prejudgment interest on all amounts awarded; and

F.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 14, 2023

Respectfully submitted,

**TIMOTHY BOZUNG**,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
**BURSOR & FISHER, P.A**.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*